IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

RODNEY D. ENGLERT,                          Civil No. 05-1863-AA
                                              OPINION AND ORDER
            Plaintiff,

      vs.

HERBERT LEON MACDONELL, TERRY
L. LABER, BARTON P. EPSTEIN,
PETER R. DE FOREST, STUART H.
JAMES, and PATRICIA LOUGH,

            Defendants.
_____

Victor Calzaretta
Attorney at Law
621 S.W. Morrison St., Suite 440
Portland, OR  97205
      Attorney for plaintiff

Eric Neiman
Williams Kastner & Gibbs, PLLC
888 S.W. Fifth Ave., Suite 600
Portland, OR  97204
      Attorney for Herbert Leon
      MacDonell

Charles F. Hinkle
Stoel Rives, LLP
900 S.W. Fifth Ave., Suite 2600
Portland, OR  97204
      Attorney for defendants Terry
      L. Laber, Barton P. Epstein,
      Peter R. De Forest, Stuart H.
      James, and Patricia Lough

///

///

1   - OPINION AND ORDER

AIKEN, Judge:

Plaintiff Rodney D. Englert filed a complaint for defamation and libel against Herbert Leon MacDonell, Terry L. Laber, Barton P. Epstein, Peter R. De Forest, Stuart H. James, and Patricia Lough in Multnomah County Circuit Court. Defendants Laber, Epstein, De Forest, James and Lough (hereinafter "the Laber defendants") filed for removal to U.S. District Court based on diversity, and later filed a special motion to strike based on Oregon's "Anti-SLAPP" (strategic litigation against public participation) law, O.R.S. §§ 31.150-31.155. Defendant MacDonell filed a motion to dismiss for lack of personal jurisdiction and in the alternative an Anti-SLAPP motion to strike.

The court heard oral argument on April 17, 2006. For reasons stated below, MacDonell's motions to dismiss for lack of personal jurisdiction and alternative special motion to strike are denied. The Laber defendants' special motion to strike is granted in part and denied in part.

## BACKGROUND

Plaintiff Rodney D. Englert, a former police officer, provides forensic consultation and expert witness testimony related to homicide investigations and other criminal investigations. For 25 years, he has provided investigative skills and in-court testimony, primarily for federal and state prosecuting attorneys. All defendants in this case similarly provide expert testimony in criminal trials, although primarily for defense attorneys.

///

2    - OPINION AND ORDER

The Laber defendants and their ethics complaints

Plaintiff, as well as the Laber defendants, all belong to the American Academy of Forensic Science (AAFS), a group formed in 1948 and today comprising of 5,600 physicians, attorneys, dentists, toxicologists, physical anthropologists, psychiatrists, engineers, criminalists, police scientists, and others, all of whom actively practice forensic science including teaching and researching in the field. Courts frequently recognize membership in the group as an indicator of the professional qualifications necessary to qualify an expert witness in forensic science. See, e.g., U.S. v. Frazier, 387 F.3d 1244, 1257, 1264 n. 17 (11th Cir. 2004); U.S. v. Everett, 972 F. Supp. 1313, 1324 (D. Nev. 1997); People v. Farnam, 28 Cal. 4th 107, 47 P.3d 988, 1028 (2002), cert. denied, 537 U.S. 1124 (2003).

Englert, Epstein, Laber, and James are also members of the Federal Bureau of Investigation Laboratory's Scientific Working Group on Bloodstain Pattern Analysis (SWGSTAIN). Formed in 2002, SWGSTAIN serves as a forum for bloodstain pattern analysis (BPA) practitioners and related fields to share, discuss and evaluate methods, techniques, protocols, quality assurance, education, and research.

Moreover, Englert is a founding member of the International Association of Blood Pattern Analysis (IABPA), a private organization formed in 1983 to promote education and encourage research in the field of bloodstain pattern analysis. Its 600 members worldwide represent various scientific and law enforcement backgrounds.

3    - OPINION AND ORDER

In June 2003, the Laber defendants filed an ethics complaint with AAFS, alleging Englert violated the organization's code of ethics by misrepresenting his education, training, experience and area of expertise in his Curriculum Vitae (CV) and in his trial testimony.  Epstein Decl. Ex. 1. Additionally, in affidavits accompanying the complaint, Epstein, De Forest, James and Lough alleged Englert misrepresented data in specific court cases.

In September 2003, the Laber defendants submitted the same material to IABPA.  Consequently, in 2003, Englert began receiving inquiries from attorneys around the country requesting information on the AAFS complaint.  Englert hired an attorney to prepare responses to prosecutors in Hawaii, New York, and Idaho explaining the AAFS hearing process.  Pl. Ex. 50, Aff'd. Englert, p.5.

On October 2, 2003, Tacoma, Washington attorney Phillip Thornton received a copy of the ethics complaint material, allegedly from defendant Stuart James.  Pl. Ex. 7.  On October 3, 2003, Thornton also received a vitriolic e-mail regarding Englert, from MacDonell.  In October 2003, a Superior Court Judge in Tacoma issued an order denying disclosure of the AAFS ethics complaint materials.  Pl. Ex. 50, Aff'd. Englert, p.5, Pl. Ex. 15.

Englert's attorney received a letter dated February 13, 2004, from San Diego County Deputy District Attorney Stacy Running, who prosecuted a case in which Englert served as an expert for the County, and Epstein served as an expert for the defense. Pl. Ex. 52.  According to Running, Lough assailed her

for using Englert as an expert witness.  Specifically, Lough
alleged that Englert's testimony was not scientifically valid.
Running described Lough as being "on a witch hunt" and,
conversely, Englert as "well-respected."  Id.

On February 16, 2004, the AAFS conducted a hearing which
De Forest and James attended, although neither testified.
Approximately 20 minutes after the hearing concluded, one of
the Board members advised Englert he had been completely
exonerated of all allegations.  Plaintiff's Memorandum in
Opposition to Special Motion to Strike, p. 9 and Pl. Ex. 50,
Aff'd. Englert, 4.  Englert received official notification of
the AAFS exoneration on May 13, 2004. Pl. Ex. 22.

On May 14, 2004, Epstein lodged a third ethics complaint
with SWGSTAIN incorporating the same material and affidavits
originally submitted to AAFS. Epstein Decl. ¶9 and Epstein Ex.
9, 10, 11, and 12.  The SWGSTAIN complaint noted the material
included all documentation sent to AAFS, as well as four new
documents:  two affidavits from a New York attorney who cited
alleged instances of Englert providing false testimony in court
and two letters from James O. Pex, a former laboratory director
for the Oregon State Police in which Pex questioned statements
on Englert's CV and the accuracy of court testimony given by
Englert. Id.

A May 25, 2004, letter from Epstein to AAFS President
Richard Singer indicates Epstein learned of the AAFS
exoneration on or about May 18, 2004.  Pl. Ex. 24.  Under the
AAFS Bylaws, only the subject of the complaint can appeal to
the executive board.  Nevertheless, in his letter Epstein

sought detailed information from the AAFS regarding their
reason for exonerating Englert.

In June, July and again on September 13, 2004, Epstein
continued to e-mail SWGSTAIN urging follow-up on his complaint.
Pl. Ex. 25-27.  On September 5, 2004, Epstein sent an e-mail to
IABPA stating that AAFS had not yet dismissed the complaint
against Englert.  Pl. Ex. 30.  On September 10, 2004, Epstein
received a letter from Singer indicating that Englert agreed to
correct offending portions of his CV, although emphasizing
there was no impropriety, and that, "[b]arring any positive
proof that  [Englert's] testimony was deliberately intended to
misrepresent the facts of the case, there is really nothing
that the Ethics Committee can do at this time."  Second
Declaration of Barton P. Epstein in Support of Special Motion
to Strike,  Ex. 1, 1.  Singer noted that the issues in question
were subject to cross-examination at trial, and though Singer
was troubled by some testimony, he said, "As you know, this is
basically opinion testimony, and under our current Bylaws, it
is not unethical to be ignorant." Id.

On September 17, 2004, Lough sent a letter to the San
Diego County District Attorney's office, noting she had
received Singer's letter and expressing continued concern with
Englert's "incorrect testimony" in two trials. Pl. Ex. 32.
Lough opined that Englert was "not ignorant, but well
understood the implications of his testimony," and thus urged
the District Attorney's Office to refrain from using Englert's
services in the future.  Id.

Despite a February 8, 2005, cease and desist letter to

1    Epstein from Englert's attorney, on February 10, 2005, Epstein

2    sent members of the SWGSTAIN Executive Board the previously

3    submitted AAFS ethics complaint material.  On February 28,

4    2005, SWGSTAIN Chair Tony Onerato e-mailed Englert that the FBI

5    and SWGSTAIN considered the ethics matter closed.

6    <u>Defendant MacDonell</u>

7        Englert alleges the AAFS ethics complaint included

8    information from MacDonell. MacDonell, however, did not sign

9    the Laber defendants' AAFS submission and the record does not

10   include any affidavits submitted by MacDonnell in support of

11   the Laber defendants' ethics complaints.  Therefore, this court

12   will not include MacDonell in the analysis of actions taken

13   against Englert within the confines of the ethics complaint.  I

14   find nothing in the record to support MacDonell's involvement

15   or participation in the ethics complaint.

16       Englert does, however, provide a series of letters

17   authored by MacDonell beginning in 1993 accusing Englert of

18   being a "Frankenstein monster," "forensic whore," "liar for

19   hire," and a "charlatan" relating to his work as a blood

20   spatter expert.

21       Further, the brother of a murder victim, William Crank,

22   states that in April 2000, MacDonell began an unsolicited

23   conversation with him in which he attacked and criticized

24   Englert, who had testified as an expert witness in Crank's

25   sister's homicide trial.  Pl. Ex. 55, Aff'd. Crank at 1-2.

26       Prosecuting Attorney Jim. J. Thomas in Blaine County,

27   Idaho recounts a similar event in March 2005, in which

28   MacDonell telephoned him to accuse Englert of perjury, saying

7    - OPINION AND ORDER

that Englert would say anything in court if paid, and that MacDonell would do whatever he could to get Englert out of the forensic expert business. Pl. Ex. 53, Aff'd. Thomas at 1-2. Around that same time, the Idaho Attorney General's Criminal Division in Boise notified Englert of documents left throughout the courthouse stating: "To whom it may concern – if you would be interested in Rod Englerts [sic] real background, training and credibility you should contact Herbert Leon MacDonell. . ." Pl. Ex. 40.

Finally, a police sergeant in Huntington, West Virginia states that during a class MacDonell was teaching on blood patterns in Corning, New York, MacDonell called Englert a "charlatan," a "liar," and "untrustworthy." Pl. Ex. 54, Aff'd. Castle at 1-2.

Englert's defamation action

In September 2005, Englert received notice of many of the writings by MacDonell and the Laber defendants. He filed this action on November 3, 2005, amending it November 9, 2005, to allege that defamatory statements by the Laber defendants and MacDonell were published and/or republished in Multnomah County, Oregon, bringing him into public contempt and ridicule, and diminished in the esteem, respect, goodwill and confidence in which he had been held.

MacDonell alone challenges this court's personal jurisdiction, and raises a question of whether Englert can prevail on his claim due to the statute of limitations.

///

///

**STANDARDS**

1.  Personal jurisdiction

Defendant MacDonell moves to dismiss for lack of personal jurisdiction.  Fed. R. Civ. P. 12(b)(2).  The plaintiff bears the burden of establishing personal jurisdiction by a preponderance of the evidence.  Hirsch v. Blue Cross, Blue Shield of Kansas, 800 F.2d 1474, 1477 (9th Cir. 1986).  A two-part showing is required: (1) the forum state must have an applicable long-arm statute; and (2) the assertion of jurisdiction must comport with the constitutional requirements of due process.  Data Disc, Inc. v. Systems Technology Assoc., Inc., 557 F.2d 1280, 1286 (9th Cir. 1977).

In diversity actions, federal courts must first examine the state's jurisdictional statute to determine if it provides for jurisdiction.  Sinatra v. National Enquirer, Inc., 854 F.2d 1191, 1194 (9th Cir. 1988).  Oregon's jurisdictional statute confers personal jurisdiction coextensive with due process.  Or. R. Civ. P. 4L.  As a result, "[t]his court need only analyze whether exercising jurisdiction comports with due process."  Sinatra, 854 F.2d at 1194.

Due process requires minimum contacts between the defendant and the forum state such that the exercise of personal jurisdiction does not offend "traditional notions of fair play and substantial justice."  International Shoe Co. v. State of Washington, 326 U.S. 310 (1945).

2.  Special Motion to Strike

O.R.S. §§ 31.150 - 31.155 comprise Oregon's "Anti-SLAPP" statutes.  "Anti-SLAPP" stands for "Anti-Strategic Lawsuit

9    - OPINION AND ORDER

Against Public Participation." <u>Metabolife Int'l, Inc. v.</u>
<u>Wornick</u>, 264 F.3d 832, 837 n.7 (9th Cir. 2001). The purpose of
similar statutes has been described as the "protection of
individuals from meritless, harassing lawsuits whose purpose is
to chill protected expression." <u>Id</u>. Under these statutes, a
defendant may make a special motion to strike against a claim
in a civil action that arises out of:

> (a) Any oral statement made, or written statement or other
> document submitted, in a legislative, executive or
> judicial proceeding or other proceeding authorized by law;
> (b) Any oral statement made, or written statement or other
> document submitted, in connection with an issue under
> consideration or review by a legislative, executive or
> judicial body or other proceeding authorized by law;
> (c) Any oral statement made, or written statement or other
> document presented, in a place open to the public or a
> public forum in connection with an issue of public
> interest; or
> (d) Any other conduct in furtherance of the exercise of
> the constitutional right of petition or the constitutional
> right of free speech in connection with a public issue or
> an issue of public interest.

O.R.S. § 31.150(2).

Defendants in federal court may avail themselves of the
Anti-SLAPP statute provisions. <u>Gardner v. Martino</u>, Civil No.
05-769-HU (D. Or. 2005) (citing <u>Card v. Pipes</u>, Civil No. 03-
6327-HO (D. Or. 2004)); see also <u>Thomas v. Fry's Electronics,</u>
<u>Inc.</u>, 400 F.3d 1206, 1206-07 (9th Cir. 2005).

10    - OPINION AND ORDER

To succeed on the motion, defendants must first make a
prima facie showing that the claims to which the motion is
directed arise out of one of the categories of civil actions
described in O.R.S. § 31.150(2).  See O.R.S. § 31.150(3).
Then, the burden shifts to plaintiffs to show a probability
that they will prevail on the defamation claim by presenting
substantial evidence to support a prima facie case.  Id.  If
plaintiff fails to meet this burden, the court shall grant the
motion and enter a judgment of dismissal without prejudice.
O.R.S. § 31.150(1).

**DISCUSSION**

This court will first address MacDonell's individual
claims regarding personal jurisdiction and the statute of
limitations for libel actions.  I will then address the Anti-
SLAPP motion first in context of the Laber defendants' ethics
complaints and second in the context of all defendants'
actions.

**I.  MacDonell's Motion to Dismiss for Lack of Personal
Jurisdiction and Statute of Limitations**

A. Personal Jurisdiction

MacDonell avers he has not been in Oregon since 1979.
Though he admits communicating with attorneys in Oregon between
1979 and 2000, he has not traveled here.  He has no employees
or registered agents in Oregon, pays no taxes in Oregon, owns
no property or assets in Oregon, and does not advertise or
actively solicit business in Oregon.

In this case, however, plaintiff demonstrates sufficient
minimum contacts between defendant and the forum state such

11   - OPINION AND ORDER

that the exercise of personal jurisdiction does not offend
"traditional notions of fair play and substantial justice."
International Shoe Co. v. State of Washington, 326 U.S. 310
(1945).

> The court may find specific personal jurisdiction where:
> 1) The nonresident defendant purposefully directs his
> activities or consummates some transaction with the forum
> or resident thereof;
> 2) the claim must be one which arises out of or relates to
> the defendant's forum-related activities; and
> 3) the exercise of jurisdiction must comport with fair
> play and substantial justice.

Schwarzenegger v. Fred Martin Motor Company, 374 F.3d 797, 802
(9th Cir. 2003) (internal citations omitted).

In 2003, the 9th Circuit reaffirmed the Calder three-part
test regarding purposeful direction. Schwarzenegger, 374 F.3d
at 803. The Ninth Circuit held that Calder stands for the
proposition that purposeful availment is satisfied even by a
defendant whose only "contact" with the forum state is the
"purposeful direction" of a foreign act having effect in the
forum state. Id. (internal citations omitted).

In Calder v. Jones, professional entertainer Shirley Jones
brought suit in California Superior Court claiming that she had
been libeled in a tabloid newspaper article. Calder v. Jones,
465 U.S. 783 (1984). The Supreme Court found the intentional
acts of the reporter and editor, though taking place in
Florida, were expressly aimed at California where the allegedly
libelous story concerned the California activities of a

12    - OPINION AND ORDER

California resident, impugning her reputation where her career was centered. <u>Calder</u>, 465 U.S. at 788-790.  Further, <u>Calder</u> held that publishers of allegedly defamatory material should "reasonably anticipate being hailed into court" in the forum state to answer the truth of the statements made. <u>Calder</u>, 465 U.S. at 790 (quoting <u>World-wide Volkswagen Corp. v. Woodsin</u>, 444 U.S. 286, 297 (1980)).

The Court set out an "effects" test requiring that the defendant allegedly have "1) committed an intentional act; 2) expressly aimed at the forum state; 3) causing harm that the defendant knows is likely to be suffered in the forum state." <u>Schwarzenegger</u>, 374 F.3d at 803 (internal citations omitted).

Here, MacDonell intentionally contacted individuals within the law enforcement and blood stain expert witness community across the country continuously over 13 years.  In at least one instance, he allegedly expressed his intent to run Englert out of business.  Pl. Ex. 53, Aff'd. Thomas.  MacDonell expressly aimed his comments toward Englert's activities occurring in part in Oregon in order to impugn Englert's reputation in Oregon.  As such, MacDonell should have reasonably anticipated being hailed into court in Oregon to defend his comments as truthful.  <u>Schwarzenegger</u>, 374 F.3d at 803 (internal citations omitted).

MacDonell's motion to dismiss based on personal jurisdiction is denied.

        B.  Statute of Limitations

MacDonell also argues Englert's claims fall outside the one year statute of limitations under O.R.S. 12.120(2).  In his

13    - OPINION AND ORDER

1    initial motion to dismiss, MacDonell asserted this claim

2    alleging that Englert relied only on a 1993 letter MacDonell

3    admits having written.  Englert's response, however, makes

4    clear that additional incidents are at issue.

5         Englert provides affidavits demonstrating MacDonell made

6    defamatory communications within the last year.  Further, under

7    Oregon's discovery rule, a claim for defamation based on

8    statements made in confidential documents does not accrue until

9    plaintiff discovers its contents.  Holdner v. Oregon Trout, 173

10   Or. App. 344, 351, 22 P.3d 244 (2001) (citing White v. Gurnsey,

11   48 Or. App. 931, 935-36, 618 P.2d 975 (1980)).  Thus, Englert's

12   September 2005 discovery of MacDonell's older confidential

13   communications falls within the statute of limitations under

14   the discovery rule.  I note that MacDonell's counsel failed to

15   raise this issue during oral argument, presumably due to the

16   affidavits demonstrating more recent comments by MacDonell.

17        Any claim by MacDonell regarding the statute of

18   limitations would therefore be fruitless and is denied.

19   **II.  Anti-SLAPP Motions by MacDonell and Laber Defendants**

20        The Oregon legislature adopted "Anti-SLAPP" legislation in

21   2001 modeled after California's 1992 statute.  In Metabolife

22   Int'l, the Ninth Circuit noted the California legislation was

23   intended to allow early dismissal of meritless first amendment

24   cases aimed at chilling speech through costly, time-consuming

25   litigation over statements made in a public forum in connection

26   with an issue of public interest.  Metabolife Int'l, 264 F.3d

27   at 840.

28        Oregon's statutes differ in several ways, however, from

14   - OPINION AND ORDER

1    the California statutes.  California's Anti-SLAPP statute

2    expressly calls for broad construction; Oregon's does not.

3    Cal. C.C.P. § 425.16(a).  The legislative history behind

4    Oregon's statute underscores that the focus of the statute is

5    to encourage public participation in the political process.

6        Here, the Laber defendants assert that in submitting their

7    ethics complaint, they were exercising their right of free

8    speech in connection with a public issue or issue of public

9    interest as provided for under O.R.S. § 31.150(2)(d).

10   MacDonell similarly argues his statements were in furtherance

11   of free speech under the same clause, arguing briefly that his

12   comments related to expert testimony on forensic science in

13   homicide and thus fall within a public interest standard.

14       A.  Laber defendants' ethics complaints

15       The Laber defendants assert that the public interest is a

16   broad standard, citing two recent Oregon Anti-SLAPP cases,

17   Thale v. Business Journal Publications, Multnomah County

18   Circuit Court No. 0402-02160 (2004) and Kurdock v. Electro

19   Scientific Industries, Inc., Multnomah County Circuit Court No.

20   0406-05889 (2004), and two Oregon District Court cases, Gardner

21   v. Martino, Civil No. 05-769-HU (D. Or. 2005) and Card v.

22   Pipes, Civil No. 03-6327-HO (D. Or. 2004).

23       Thale, Gardner, and Card all involved publication by the

24   media, as distinguished from this case which occurred between

25   private individuals, without publication by the media.  The

26   constitutionally protected speech in Card consisted of comments

27   in the newspaper by a public university regarding political

28   activism in the classroom.  Thale and Gardner both concerned

15   - OPINION AND ORDER

1    statements published by, respectively, a newspaper and a radio

2    broadcaster.  Kurdock is most closely on point, where a private

3    individual sued his former employer for defamation, though the

4    defamation claim centered around a factual statement in a news

5    release, which plaintiff alleged was defamatory by implication

6    alone.  Kurdock, supra.

7        The Laber defendants also equivocate public interest to

8    newsworthiness, citing Hamilton v. Crown Life, 246 Or. 1, 5,

9    423 P.2d 771, 773 (1967), in which news reports of a private

10   person's suicide were found not to be an invasion of privacy

11   because the event was "newsworthy."  The Laber defendants rely

12   on the dictionary definition of newsworthy as "sufficiently

13   interesting to a general public to warrant reporting in the

14   news." Webster's Third New International Dictionary 1524

15   (unabridged ed. 2002).  If the court, however, were to accept

16   this definition, there is no subject, comment, or action that

17   would ever be beyond the bounds of "public interest" in a world

18   where news reports run the gamut of celebrity marriages and

19   divorces, waterskiing squirrels, exploding whales, and national

20   anthem singing tryouts.

21       More convincing as "public interest" topics are consumer

22   issues, as in Gardner and Traditional Cat Association, Inc. v.

23   Gilbreath, 118 Cal. App. 4th 392, 13 Cal. Rptr.3d 353 (2004).

24   In Gardner, the District Court found a conversation regarding a

25   consumer transaction on a consumer-oriented talk show to be an

26   "issue of public interest."  Id. at 14. In Traditional Cat, the

27   court found litigation excerpts published on a website to be of

28   public interest to the cat breeding community.  Traditional

16    - OPINION AND ORDER

1   <u>Cat</u>, 118 Cal. App. 4th at 397.

2         Therefore, on the sole issue of the comments made by the

3   Laber defendants in support of the ethics complaints, I agree

4   that those comments constituted an exercise of free speech in

5   connection with a public issue.  Just as the Oregon legislature

6   intended to encourage political debate over public policy, so

7   should we encourage investigation of ethics violations which

8   improve professional standards, particularly where courtroom

9   experts are concerned.

10        Thus, the ethics complaints signed by the Laber defendants

11  as a group satisfy the "issue of public interest" requirement

12  of Oregon's Anti-SLAPP statute.  Because I find that the

13  statute applies, the burden then shifts to Englert to establish

14  1) a prima facie case of defamation; and 2) substantial

15  evidence to demonstrate a probability he will prevail.

16            <u>1.  Englert's Prima Facie case for defamation</u>

17        To establish a prima facie defamation claim, a plaintiff

18  must present evidence sufficient to show that the defendant

19  published a defamatory statement about the plaintiff, to a

20  third person.  <u>Hutchinson v. Menlo Logistics, Inc.</u>, 2006 WL

21  44196 at *4 (D. Or. 2006) (internal citations omitted).  A

22  defamatory statement is one that would subject another to

23  "hatred, contempt, or ridicule ... [or] tend to diminish the

24  esteem, respect, goodwill or confidence in which [the other] is

25  held or to excite adverse, derogatory or unpleasant feelings or

26  opinions against [the other]." <u>Affolter v. Baugh Construction</u>

27  <u>Oregon, Inc.</u>, 183 Or. App. 198, 202-203, 51 P.3d 642, 644

28  (2002) (citing <u>Reesman v. Highfill</u>, 327 Or. 597, 603, 965 P.2d

    17   - OPINION AND ORDER

1   1030 (1998)); see also Worley v. Oregon Physicians Service, 69

2   Or. App. 241, 244, 686 P.2d 404, 406 (1984).

3        Generally, statements that impute an inability to perform

4   one's official or employment duties, or prejudice a plaintiff

5   in his profession are considered defamatory per se. Cook v.

6   Safeway Stores, Inc., 266 Or. 77, 82, 511 P.2d 375, 378 (1973);

7   but see, Walleri v. The Federal Home Loan Bank, 83 F.3d 1575,

8   1583 (9th Cir. 1996) (reciting the reasons for plaintiff's

9   termination as not defamatory); Hardie v. Legacy Health System,

10   167 Or. App. 425, 432, 6 P.3d 531, 536 (2000), rev. den., 332

11   Or. 656, 36 P.3d 973 (2001).

12        The Laber defendants' assertions that Englert

13   misrepresents his qualifications and provides false testimony

14   clearly prejudiced Englert in his profession and thus gives

15   rise to a defamation action.  This is evidenced by the numerous

16   inquiries from attorneys around the country regarding his

17   fitness to serve as an expert witness.

18        Therefore, I find that Englert meets his burden and

19   establishes a prima facie case of defamation.  I next consider

20   whether that evidence is substantial to demonstrate a

21   probability of prevailing on his defamation claim.

22        2.  Probability of prevailing on the defamation claim

23        Due to the strong First Amendment protection for free

24   speech, several exceptions to a defamation claim exist,

25   including the "common interest privilege," and comments

26   regarding "public figures."  Because I find the common interest

27   privilege applies,  I will not discuss the public figure

28   exception.

18   - OPINION AND ORDER

1            a.  Common interest privilege

2       Under common law, a defamatory statement may be

3  conditionally privileged if: "*** it was on a subject of mutual

4  concern to defendants and the persons to whom the statement was

5  made." Wattenburg v. United Med. Lab, 269 Or. 377, 380, 525

6  P.2d 113, 114 (1974).

7       The Laber defendants cite several cases where the common

8  interest privilege has been held to apply to association

9  members objecting to qualifications or actions of particular

10  members.  In McKnight v. Hasbrouck, a physician and honorary

11  member of the Homeopathic Society of New York brought a libel

12  action against another member who wrote the society saying

13  plaintiff was a "blow-hard, without the slightest degree of

14  principle," and had "long since prostituted all his former

15  claims on the profession." McKnight v. Hasbrouk,  17 R.I. 70,

16  20 A. 95, 95 (1890).  In Ramstead v. Morgan, the Oregon Supreme

17  Court held that ethics complaints against an attorney filed

18  with the Oregon State Bar were absolutely privileged.  Ramstead

19  v. Morgan, 219 Or. 383, 393, 347 P.2d 594, 599 (1959).

20  Similarly, in Murphy v. Harty, the Oregon Supreme Court held

21  the common interest qualified privilege applied to

22  communications between ministers of the Baptist church on a

23  subject of common concern to both of them – the charges which

24  led to plaintiff's dismissal.  Murphy v. Harty, 238 Or. 228,

25  244, 393 P.2d 206, 214 (1964).

26       As in McKnight, Ramstead, and Murphy, the Laber

27  defendants' communications with the AAFS, IABPA and SWGSTAIN

28  organizations clearly demonstrate a mutual concern for

19   - OPINION AND ORDER

upholding the standards of the organization.  Thus, in regard to the Laber defendants' statements in their ethics complaints, the common interest privilege applies.

The common interest privilege, however, is a conditional privilege, and a plaintiff can pierce that privilege by showing that it was abused.  Wallulis v. Dymowski, 323 Or. 337, 348, 918 P.2d 755 (1996).  Abuse can occur in four ways:

> 1) if the speaker does not believe that the statement is true or lacks reasonable grounds to believe that it is true; 2) if it is published for a purpose other than that for which the particular privilege is given; 3) if the publication is made to some person not reasonably believed to be necessary to accomplish the purpose; or 4) if the publication includes defamatory matter not reasonably believed to be necessary to accomplish the purpose.

Lund v. Arbonne International, Inc., 132 Or. App. 87, 96, 887 P.2d 817, 823 (1994) (internal citations committed).

I find that the "individual" actions by the Laber defendants do not tarnish the common interest of the actions taken by the defendants as a group, specifically in bringing the ethics complaints against the plaintiff. Therefore, I find the Laber defendants' submission of ethics complaints to the AAFS, SWGSTAIN, and IABPA organizations fall squarely within the common interest privilege, and not subject to abuse of that privilege.

In sum, I find the hearsay rule does not apply[1]; and that

---

[1]    All parties assert throughout their briefs that certain exhibits offered in support or opposition to the motion considered today are hearsay and inadmissible in considering the motion.  To briefly address the issue, O.R.S. 40.450 commentary regarding subsection (3) notes that "operative facts" and "verbal acts" are exceptions to hearsay and admissible regardless of the truth of the matter asserted.  See ORS 40.450,

the common interest privilege does apply to the statements by
the Laber defendants' in pursuit of the ethics complaints
against plaintiff. Therefore, pursuant to the Oregon Anti-SLAPP
laws, the Laber defendants' special motion to strike is
therefore granted in part as to the Laber defendants' speech in
pursuit of the ethics complaint against the plaintiff.

B. Actions beyond the ethics complaint by Epstein, James,
Lough and MacDonell

Epstein, James, and Lough's "independent" statements,
however, fall outside of any public interest in filing ethics
complaints before an impartial body that weighs the evidence.
Similarly, MacDonell's communications appear consistently
independent of any ethics complaint.  These defendants have
actively sought to discredit Englert in circles from which he
may draw employment.  I cannot find the "independent" actions
by these defendants in the public interest within the
requirement of Oregon's Anti-SLAPP statute.[2]

commentary re: Subsection (3).
    In Hickey v. Settlemier, the Oregon Supreme Court held that
a video offered to show a defendant made defamatory statements
was not offered to prove the truth of the matter asserted, but
rather only that he made the alleged statements.  318 Or. 196,
203, 864 P.2d 372, 376 (1993). In Robinson v. Pacific Retirement
Services, 2005 WL 139075 (D. Or. 2005), this court held that a
mere assertion libelous and slanderous statements were made,
without indication of whether they were written or oral, was
insufficient to support a defamation claim.
    Here, however, Englert has provided documentation to
support his claim that defendants published defamatory
statements.  Those documents are admissible in considering this
motion because they are offered not to demonstrate the truth of
the matter asserted, but simply to show that statements were
made which could be taken as defamatory.

[2]    The record contains no evidence that defendants Laber or De
Forest made any comments or took any independent actions
regarding plaintiff outside of the ethics complaints.

21   - OPINION AND ORDER

I find persuasive both the 2003 revisions to California's Anti-SLAPP law, as well as the California district court's analysis and holding in the 2003 case, MCSI, Inc. v. Woods, where the court held that speech between competitors was not a matter of public interest. MCSI, Inc. v. Woods, 290 F. Supp. 2d 1030 (N.D. Cal 2003). In MCSI, the manufacturer of audio-visual equipment sued a competitor for unfair competition for posting negative statements on an internet chat board. The court held that the statements of one company regarding a competitor do not satisfy the "issue of public interest" requirement of California's Anti-SLAPP statute, despite the publication of the comments on a web site criticizing management of a large corporation. Id.

Here, all of the defendants are in a sense, competitors with Englert as they frequently find themselves on opposite sides of the courtroom. Because Epstein, Lough, and James are actively competing for "business" with the plaintiff, I find their broad-ranging criticisms outside of the ethics complaint venue, and MacDonell's longstanding assaults on Englert's character, fail to satisfy the Anti-SLAPP public interest standard.

Even if this court were, however, to find that defendants' "independent" actions fell within the public interest, I find that the common interest privilege would not apply to the statements and actions of Epstein, James and Lough, as they abused that privilege. Contrary to the common interest privilege applications in MacKnight and Ramstead, communications by Epstein, James and Lough extended far beyond

1    the parties necessary to achieve action against Englert, via

2    the AAFS ethics committee.  I note that at least the AAFS

3    policies and procedures require ethics investigations to be

4    handled in confidence.  *See* Pl. Ex. 2.  The proactive contacts

5    by Epstein, James and Lough with attorneys who employed or

6    opposed Englert could not reasonably have been believed

7    necessary to accomplish the purpose for which the common

8    interest privilege was given, as the attorneys contacted were

9    not members of the defendants' profession and held no mutual

10   interest.

11        A failure to act affirmatively to verify an allegation, is

12   not, by itself, sufficient to defeat a conditional privilege.

13   Morlan v. Qwest Dex, Inc., 332 F.Supp. 2d 1356, 1364 (D. Or.

14   2004) (citing Muresan v. Philadelphia Romanian Pentecostal

15   Church, 154 Or. App. 465, 472, 962 P.2d 711 (1998)).  However,

16   Epstein's assertions that the AAFS ethics complaint was still

17   under investigation, a full year after the record clearly shows

18   he had notice of its dismissal, signals a lack of reasonable

19   grounds for him to believe it was true.

20        The defendants and MacDonell suggest that Englert's

21   qualifications as an expert witness and the reliability of his

22   testimony are a matter of public interest.  I don't disagree,

23   but note that interest is already served by the courtroom

24   advocacy process where the court evaluates expert

25   qualifications and fact finders weigh the testimony of opposing

26   expert witnesses, allowing for full consideration of broad-

27   ranging comment and criticism.  The questions regarding

28   Englert's qualifications and the accuracy of his statements

23   - OPINION AND ORDER

were raised, debated, and decided in a court of law.

As previously noted, MacDonell did not join in the Laber defendants' ethics complaints and therefore has no common interest privilege exception.  Englert provides evidence of a long history of MacDonell's statements assaulting his character, qualifications, and veracity, all of which are capable of defamatory meaning.  MacDonell's statement that he wished to run Englert out of business demonstrates his comments were not in the public interest.

Therefore, while I find that Oregon's Anti-SLAPP statute applies to the Laber defendants' ethics complaints, the independent actions of defendants Epstein, James, Lough and MacDonell do not fall within the protection of public interest speech under Oregon's Anti-SLAPP statute, and even if they did, defendants have abused any common interest privilege afforded them.  The motion to strike as to these defendants for their "independent" (non ethics complaint related) speech is denied.

## CONCLUSION

The Laber defendants' motion to strike (doc. 9) based on Oregon's Anti-SLAPP statute is granted in part and denied in part as follows:  the Laber defendants exercised their free speech rights in connection with an issue of public interest when they filed ethics complaints against the plaintiff. Thus, Oregon's Anti-SLAPP statute applies in sole regard to the Laber defendants' speech regarding the ethics complaints.  Because Englert then failed to present substantial evidence he would prevail in a defamation case where defendants acted within the common interest privilege, the Anti-SLAPP Special Motion to

24    - OPINION AND ORDER

Strike in regards to the Laber defendants' ethics complaints is granted (doc. 9) and the action is dismissed without prejudice as to those defendants on that limited basis.

However, the defendants' motion to strike (doc. 9) is denied as to further communications by Epstein, James and Lough which were not in pursuit of constitutional speech in the public interest. I find that Epstein, James and Lough remain as defendants in this case. Because I find no evidence in the record that defendants De Forest and Laber participated in any speech against plaintiff outside of the ethics complaints, these two defendants are dismissed from this lawsuit for all purposes.

Finally, MacDonell's Motion to Dismiss for lack of Personal Jurisdiction (doc. 14), as well as his alternative special Anti-SLAPP motion to strike (doc. 14) are denied.

IT IS SO ORDERED.

Dated this  10   day of May, 2006.


                              /s/ Ann Aiken
                              Ann Aiken
                    United States District Judge